# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSHUA DAVID MICHAEL, | ) | Case No. 09-11623 |
| | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| EVERETT B. SASLOW, Trustee, and | ) | |
| MICHAEL D. WEST, United States | ) | |
| Bankruptcy Administrator | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No.  10-02008 |
| | ) | |
| vs. | ) | |
| | ) | |
| JOSHUA DAVID MICHAEL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This adversary proceeding was tried on March 16 and 18, 2011.  Robert E. Price appeared

on behalf of Everett B. Saslow, the Chapter 7 Trustee (the "Trustee"), and Michael D. West, the

United State Bankruptcy Administrator (collectively, the "Plaintiffs"). The defendant, who is the

above-referenced debtor, Joshua David Michael (the "Debtor"), appeared pro se.[1]  In this case, the

Plaintiffs seek a denial of the Debtor's bankruptcy discharge pursuant to Section 727(a) of the

Bankruptcy Code, claiming that he: (1) transferred property of the estate within one year prior to

filing his bankruptcy petition, with the intent to hinder, delay, or defraud his creditors; (2) concealed,

---

[1]During the course of this adversary proceeding, the Court advised the Debtor several
times that it would be in his best interests to employ counsel.  For reasons unknown to the Court,
the Debtor refused to employ counsel even though he clearly had the means to do so.

destroyed, falsified, or failed to keep or preserve recorded information from which the financial condition or business transactions of his business might be ascertained; and (3) knowingly and fraudulently, in or in connection with the case, made a false oath or account. As the Court announced at the end of the trial, based upon the evidence presented, the arguments presented, and a review of the entire official file, the Debtor's discharge will be denied. This opinion explains the basis for the Court's ruling through the following findings of fact and conclusions of law.

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), which this Court has the jurisdiction to hear and determine.

## II. FACTS

This story is an often told tale, at least at the beginning. A young man with fresh ideas goes into business. He works hard and captures the attention of a sufficient portion of the market. Sales are strong for the first few years, and the young man expands the business to meet the growing demand for his products. But this market is fickle, as all markets are, and one year, just after the business has purchased large amounts of inventory to meet the anticipated demands of the next season, sales drop precipitously. The business cannot pay its vendors, and the bank begins to make demands of its own. It is clear that the business is going to fail.

Here is where the young man goes astray, and the story deviates from the norm. Rather than accept the failure of his business with resigned grace and equanimity, the young man schemes to defraud the creditors of the business by taking and secreting the company's assets so that he can use

them in a new business, leaving the creditors of his old business to fend for themselves.  The young man has talent in the field of sales, but he has no gift for the art of theft.  Unwisely, he enlists the aid of the employees of his old business and directs them to participate in the scheme by falsifying records, moving inventory to the new business, hiding cash, and other nefarious activities.  They do so unwillingly and are so worried that what they are being asked to do is illegal or at least fraudulent, that they make notes and records of their actions, in part to protect themselves.  The young man is oblivious to the concerns of his employees.  Finally, creditors file an involuntary petition against the business.  One month later, he files his own bankruptcy.  Now for the gory details.

**A.  Crossroad Sports, Inc.**

Crossroad Sports, Inc. was a company that sold skateboarding and snow boarding equipment and accessories. It  was formed in 1998 and did business under the trade name of Board Paradise. The Debtor first bought a stake in the company in 2001.  In 2003, the Debtor purchased the rest of the equity in the company and became President and Director.  The value of Crossroad Sports was less than $1 million when the Debtor bought into the company, but by 2008 he had turned the company into an $8 million enterprise.  In the summer of 2008, however, the business of Crossroad Sports began to suffer. The company was obligated to make minimum purchases of inventory from certain vendors in order to make internet sales available to its customers.  Crossroad Sports ordered and received inventory in advance, and invoices were due to vendors several months later, after Crossroad Sports had an opportunity to market and sell the products. As the national economy began to decline in late 2008, Crossroad Sports experienced a sharp drop in sales, and found itself left with a glut of inventory that it had ordered in anticipation of the holiday season—typically the busiest

sales season of the year.  A few months later, when payments to vendors became due, Crossroad Sports was unable to pay its bills.  For the first time since the Debtor became involved with the business, Crossroad Sports showed losses for the fiscal year.

In 2009, Rachel Michael, the Debtor's ex-wife, left her position as the bookkeeper for Crossroad Sports, and the Debtor took over the finances of the company. In the second quarter of 2009, vendors started to file collection actions against Crossroad Sports for invoices from the previous year, and several vendors succeeded in obtaining judgments against the company.  At this point, many vendors changed to COD payment terms with Crossroad Sports or stopped selling to the company altogether.  In addition, Wachovia Bank made demand on two loans that it had made to Crossroad Sports, totaling between $1 million and $1.5 million. The company agreed to refinance these obligations into one loan, with increased interest and principal payments. However, when Crossroad Sports was unable to timely make the revised payments, Wachovia Bank began to debit the funds directly from the company's accounts, which created a serious cash flow problem.

Shortly thereafter, the Debtor moved the bank accounts of Crossroad Sports to Bank of America, and according to Linc Anderson, the former Chief Operating Officer of the company, the Debtor became the only person with access to those accounts. Mr. Anderson previously had access to the company's bank accounts in order to verify deposit amounts, make payments to vendors, and perform his duties as Chief Operating Officer.  After switching the accounts to Bank of America and restricting access to the accounts, the Debtor also took over responsibility for making the nightly deposits of cash.  In June 2009, after the Debtor denied him access to the financial information of the company, Mr. Anderson drafted a letter of resignation as an officer of Crossroad Sports, which

4

the Debtor signed. [Plaintiffs' Exhibit 25]. Although he was no longer an officer, Mr. Anderson continued on as an employee of the company.

Wachovia Bank made final demand on the refinanced promissory note in June of 2009, and it became clear that the company could not survive. In late June or early July of 2009, Crossroad Sports began winding down its business: the company began to run discounts on inventory, and it closed some stores. Also, in July 2009, Mr. Anderson was terminated from Crossroad Sports after an argument with the Debtor regarding missing cash deposits from stores.[2] Mr. Anderson believed that after the Debtor took over responsibility for the bank deposits, he began depositing cash into his personal accounts instead of the accounts of Crossroad Sports.

As the company closed its stores, Logan Ray, the warehouse manager for Crossroad Sports, testified that he was instructed by the Debtor to load the inventory from these locations into trucks, and deliver it to a warehouse at 2801 Patterson Street in Greensboro, North Carolina. Mr. Ray testified that the Debtor instructed him to keep the location of this warehouse "on the DL."[3] Mr. Ray, however, created a record of each item of inventory that he took from Crossroad Sports, listing the delivery location as "BP15," which indicates store number 15 of Board Paradise. However, Crossroad Sports never had a store number 15. [Plaintiffs' Exhibit 15]. It was estimated that the aggregate value of the inventory that Mr. Ray unloaded at the Patterson Avenue warehouse was worth somewhere between $1 million and $3 million.

In August of 2009, the Debtor called Mr. Anderson (whom he had fired the month before)

---

[2]Mr. Anderson testified that the Debtor fired him by sending him an e-mail while the Debtor was on vacation in Costa Rica. Pursuant to the terms of his employment contract, Mr. Anderson was owed approximately $12,000 as a severance payment, which he never received.

[3]This phrase means "on the down low" or "secret."

and asked him to perform some consulting work for the company since Mr. Anderson was the person most familiar with the company's point-of-sale ("POS") accounting system. When the Debtor asked Mr. Anderson if it was possible to program the POS system to alter the numbers that were sent from the stores to the corporate offices, Mr. Anderson refused to assist him. At about the same time, Laura Durr, who took over the general bookkeeping activities after Mrs. Michael left the company, testified that she received instructions from the Debtor to change certain records of cash deposits in the company's computerized bookkeeping system. Specifically, Ms. Durr testified that the Debtor handed her a document with several columns. It had a column for the dates of the entries that the Debtor wanted her to change, a column for the new amount of the cash deposit that he wanted entered, and, amazingly, a column titled "Cash to Keep." [Plaintiffs' Exhibit 4]. Ms. Durr testified that while she was reluctant to make these changes, she changed the entries in the system and kept the Debtor's instruction document for her records.

Finally, on August 5, 2009, creditors of Crossroad Sports filed an involuntary bankruptcy petition against the company. An order for relief was entered on August 28, 2009. On September 1, 2009, the Trustee arrived at the company's headquarters on Tarrant Road in Greensboro, North Carolina, to take control of the assets of the company, which then consisted of four stores and the corporate headquarters. The Trustee learned that the Debtor was in Las Vegas attending a trade show at company expense.[4] The Trustee found Ms. Durr at work and discussed the status of the company. He also had a conversation with Mr. Ray, who told him that he would find approximately $4,000 in cash hidden under the sink in the restroom of the company's Battleground Avenue

---

[4]The Debtor claimed he did not receive notice of the involuntary bankruptcy until the Trustee called him in Las Vegas to inform him. This statement is difficult to believe since the certificate of service and return receipt for the involuntary petition and summons evidences that they were received at the company's headquarters on August 7, 2009.

location.   That night, the Trustee, acting on this information, searched the restroom in the Battleground Avenue store and found two bags of cash taped under the sinks.[5]  The Trustee had the locks changed at the remaining locations.

On September 3, 2009, a burglary occurred at the company's store at 2323 Battleground Avenue in Greensboro; windows were broken, and watches, flat screen televisions, and other items were stolen from the premises.   A few days later, while the Trustee was at the same location investigating the burglary, he inadvertently set off the monitored security alarm. When the officer investigating the break-in arrived at the store, the officer reported to the Trustee that the alarm had also gone off the night of the break-in, but that a representative of the security company monitoring the alarm received a phone call from someone claiming to be the Debtor.  The caller told the security company that the alarm had been set off by accident on the night of September 3, 2009.[6]

The Trustee applied for and received Court authority to conduct a public auction of the assets of Crossroad Sports, which included inventory, fixtures, and business equipment.  The auction was

---

[5]The Trustee went to the Battleground Avenue store that evening, but the power had already been turned off.  He crawled under the sinks in the bathroom and searched the area using a flashlight.  The Trustee was able to locate one bag of cash. He took the bag home to count the money, enlisting the assistance of his spouse in the process, and discovered that there was only about $2,000 in the bag.  He returned to the store the next day, and with the benefit of daylight, found an additional bag containing the remaining cash.  When the Debtor was asked at trial what to make of the cash under the sink, his response was that it was not unusual for brick and mortar stores to keep cash. While the Court concedes that keeping cash in a store is not unusual, it refuses to believe that it is normal business practice to keep cash under the sink in the restroom. It was argued by the Bankruptcy Administrator that the Debtor had secreted this cash or directed someone to do it.  While circumstantial evidence supports this inference, no further proof was adduced, and the Debtor denied it.

[6]It was argued by the Bankruptcy Administrator that the Debtor himself had broken in and stolen items from this location.  While circumstantial evidence supports this inference, no further proof was adduced, and the Debtor denied it.

conducted over a ten-day period.  The Debtor purchased a few thousand dollars worth of inventory and fixtures at the auction.  In total, the Trustee received approximately $259,000 from the auction.

## B.  The Debtor's Bankruptcy

On August 28, 2009, the Debtor filed a voluntary Chapter 7 bankruptcy.  The Debtor's schedules were materially incorrect and misleading.  Only a few examples will suffice.  Everett Saslow, the trustee for Crossroad Sports, was also appointed as Chapter 7 trustee in the Debtor's individual bankruptcy, and when he met with the Debtor and his counsel on September 9, 2009, after being appointed in the individual case, the Trustee discovered that the Debtor had failed to disclose on his schedules his ownership of a townhouse in Boone, North Carolina.  Not only had the Debtor owned such property, but a little over a month before filing for bankruptcy he had sold his interest in the townhouse and realized a profit of $30,000.[7]  The Debtor later amended his schedules to reflect his ownership of the townhouse, as well as the sale.  The Trustee asked  what the Debtor had done with his portion of the proceeds, and the Debtor came to the Chapter 7 creditors' meeting on September 29, 2009, with a document indicating that, aside from about $1,500 that he had used for home improvements, he had paid more than $28,000 in cash to employees of Crossroad Sports. These payments were mainly for past due wages, and included a payment of $1,000 each to Mr. Ray and Ms. Durr, and $15,000 to Mr. Anderson for "severance pay on contract."  [Plaintiffs' Exhibit 14].  Mr. Ray, Ms. Durr, and Mr. Anderson all deny having received any such payments.  Of course, the Debtor did not have any receipts documenting the alleged payments.

Also at the creditors' meeting on September 9, the Trustee discovered that the Debtor failed to disclose the ownership of vehicles owned by Crossroad Sports as well as several domain names

---

[7]The townhouse was owned jointly by the Debtor and his ex-wife.  At closing, they split the sale proceeds of about $60,000.

owned by the company.  Only after the Trustee asked about the vehicles and domain names did the Debtor amend the Crossroad Sports schedules to include them.  In addition, the Trustee received numerous phone calls from creditors who had not received notice of the company's bankruptcy—these creditors had not been listed on the schedules.  Accordingly, the Trustee sent letters to the Office of the Clerk of Court requesting that these creditors be added to the list of parties to receive notice in the case. [Plaintiffs' Exhibits 3 & 6].

The Trustee also discovered that, as the business of Crossroad Sports was winding down in early July of 2009, the Debtor incorporated a new business, which he cleverly named Board Paradise, the trade name of Crossroad Sports.  The articles of incorporation list the address of Board Paradise as 2801 Patterson Street, Greensboro, North Carolina—the same location where Mr. Ray unloaded inventory from various Crossroad Sports stores.  Immediately upon opening, the stores of Board Paradise were stocked with inventory. Some locations even operated out of the same locations as former stores of Crossroad Sports.  The Debtor denied that any Crossroad Sports inventory was ever stored at a warehouse at 2801 Patterson Street, and he further denied that any inventory from Crossroad Sports was transferred to Board Paradise other than the limited amount of inventory that he purchased at the Trustee's auction.

### III. ANALYSIS

One of the principal goals of the Bankruptcy Code is to provide the debtor a fresh start. However, the "fresh start" policy is limited to the "honest but unfortunate debtor."  Grogan v. Garner, 498 U.S. 279, 286-87 (1991).  This policy is furthered by Section 727 of the Bankruptcy Code, which provides for the denial of a bankruptcy discharge in certain situations.

While the Plaintiffs need only succeed on one of their causes of action for the Debtor's discharge to be denied, the Court will address all three bases for denial of the Debtor's discharge that the Plaintiffs raised at trial.

A.    **11 U.S.C. § 727(a)(2)**

The Plaintiffs first contend that the Debtor should be denied a discharge pursuant to Section 727(a)(2), which provides that a court should not grant a debtor's discharge if:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > (B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2).

To prevail on a Section 727(a)(2) cause of action, a creditor must establish that the debtor (1) transferred or concealed, (2) his property, (3) with the intent to hinder, delay or defraud a creditor, (4) within one year before filing the petition.  Id.; see also Groman v. Watman (In re Watman), 301 F.3d 3, 7 (1st Cir. 2002); Vill. of San Jose v. McWilliams, 284 F.3d 785, 791 (7th Cir. 2002); CM Partnership v. Groover (In re Groover), No. 03-51013, 2004 WL 212948, at *3 (Bankr. M.D.N.C. Jan. 16, 2004).

The standard of proof in such an action is by a preponderance of the evidence.  See Grogan, 498 U.S. at 289; Farouki v. Emirates Bank Int'l, Ltd., 14 F.3d 244, 249 (4th Cir. 1994); Ferguson v. Gordon (In re Gordon), No. 99-6036, 2002 WL 925028, at *2 (Bankr. M.D.N.C. May 8, 2002). Once a prima facie case has been established, "the burden may shift to the debtor to provide

satisfactory, explanatory evidence."  Farouki, 14 F.3d at 249.  However, the creditor bears the ultimate burden of proof.  Id.

Under Section 727(a)(2), the debtor must have had the actual intent to hinder, delay, or defraud his creditors.  See Pavy v. Chastant (In re Chastant), 873 F.2d 89, 91 (5th Cir. 1989); First Leasing Co. v. McGalliard (In re McGalliard), 183 B.R. 726, 732 (Bankr. M.D.N.C. 1995). When a debtor admits that he had the intent to defraud a creditor, there is no need to rely on circumstantial evidence.  Perkins v. Arnold (In re Arnold), No. 08-2004, 2009 WL 5217056, at *4 (Bankr. M.D.N.C. Dec. 30, 2009); Adeeb v. Consumers Oil Co. (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986).  However, those debtors with fraudulent intent are unlikely to disclose it.  Thus, courts typically look to circumstantial evidence to determine whether the intent to defraud existed. McWilliams, 284 F.3d at 790 ("because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence").  Courts have identified "badges of fraud" that indicate fraudulent intent, including:

  (1)   family, friendship or insider relationships between the parties;
  (2)   the debtor's retention of possession, benefit or use of the property in question;
  (3)   the lack or inadequacy of consideration for the transfer;
  (4)   the debtor's financial condition before and after the transfer;
  (5)   the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;
  (6)   the general chronology of the events and transactions under inquiry;
  (7)   the debtor's attempt to keep the transfer a secret; and
  (8)   the proximity of the transfer to the debtor's filing bankruptcy.

See, e.g., Arnold, 2009 WL 5217056, at *4; Robertson v. Dennis (In re Dennis), 330 F.3d 696, 702 (5th Cir. 2003); Watman, 301 F.3d at 8; McWilliams, 284 F.3d at 791; Pavy, 873 F.2d at 91; Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582 (2d Cir. 1983); Annino, Draper & Moore v.

11

Lang (In re Lang), 256 B.R. 539, 541 (1st Cir. B.A.P. 2000).  A Section 727(a)(2) analysis is necessarily fact-sensitive, and the presence of only one badge of fraud may provide a basis for finding a fraudulent intent.  Groover, slip op. at 3; McGalliard, 138 B.R. at 732.  Whether the transfer actually injures a creditor is irrelevant.  McWilliams, 284 F.3d at 793.

In this case, the Plaintiffs succeeded in establishing several badges of fraud by a preponderance of the evidence.  The evidence indicates that the Debtor retained substantial amounts of inventory from Crossroads Sports, that he benefitted from its sale through his new business, Board Paradise, and that the Crossroad Sports estate received no consideration for those transfers. In addition, the evidence indicates that the Debtor attempted to keep the transfers of inventory and cash from Crossroad Sports a secret by instructing his employees to falsify books and records and to keep the location of the new warehouse where he stored the inventory "on the DL."  Furthermore these transfers took place in the weeks leading up to and immediately following the bankruptcy of Crossroad Sports.  The Debtor offered little evidence, aside from his own denials, to rebut the overwhelming evidence of the Plaintiffs.  Having observed the Debtor at trial and having gauged his credibility, the Court finds his explanations to be nothing more than delusory pretext, wholly unworthy of belief.  Accordingly, the Plaintiffs have met their burden of proof as to Section 727(a)(2), and the Debtor's discharge will be denied on this basis.

**B.    11 U.S.C. § 727(a)(3)**

Section 727(a)(3) provides that the Court shall grant the debtor a discharge unless the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified

under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). This section does not require that the debtor maintain perfect records, but she is obligated to preserve "sufficient and adequate financial records to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs." In re French, 499 F.3d 345, 355 (4th Cir. 2007). The Bankruptcy Code does not require a debtor seeking a discharge to maintain a bank account, nor does it require an impeccable system of bookkeeping. Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999). However, the records must " 'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.' The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'" Ivey v. Anderson (In re Anderson), No. 04-2070, 2006 WL 995856, at *3 (Bankr. M.D.N.C. Feb. 13, 2006) (citing Peterson, 172 F.3d at 969). Intent is not an element of a claim under this subsection. Angell v. Williams (In re Williams), No. 08-00188, 2010 WL 364459, at *6 (Bankr. E.D.N.C. Jan. 27, 2010). Furthermore, if a debtor is self-employed, his failure to keep adequate business records can justify a denial of his individual discharge. Rossi v. Moreo (In re Moreo), No. 07-8256-478, 2009 WL 2929949, at *6 (Bankr. E.D. N.Y. Sept. 10, 2009) (failure of proprietors of small business to maintain adequate records warranted denial of individual discharge under 727(a)(3)); Sullivan v. Kickel (In re Kickel), 357 B.R. 490, 494 (Bankr. N.D. Ill. 2006) (records provided by an individual debtor for a related corporate debtor fell below any reasonable standard for acceptable records for the corporate debtor, supporting denial of the individual debtor's discharge); John Deere Co. v. Broholm (In re Broholm), 310 B.R. 864, 879 (Bankr. N.D. Ill. 2004) (§ 727(a)(3) places an affirmative duty on any debtor to create books and records accurately documenting business affairs).

13

If a plaintiff demonstrates that the debtor failed to preserve sufficient and adequate financial records, then the burden then shifts to the debtor to show that such failure was justified under the circumstances.  In re Young, 346 B.R. 597, 609 (Bankr. E.D.N.Y. 2006).  Therefore, if the records of Crossroad Sports were insufficient for the Trustee to ascertain an accurate picture of its finances, and the Debtor cannot show that its failure to keep sufficient records was justified, then the Debtor's discharge should be denied.

The testimony and documentary evidence establish that the Debtor not only kept inadequate records for Crossroad Sports, but that he affirmatively altered those records to conceal transfers of cash. The former bookkeeper for Cross road Sports, Ms. Durr, testified that she was instructed to change entries in the company's computer system to reduce the reported amounts of cash deposits on certain days. The document that the Debtor gave to Ms. Durr along with these verbal instructions contained a column labeled "Cash to Keep," eliminating all doubt as to the Debtor's intentions.  The Plaintiffs clearly met their burden of showing that the Debtor failed to keep "sufficient and adequate financial records."  The Debtor's bare assertions that Ms. Durr's document was falsified and that his former employees are out to get him[8] do nothing to prove that his a failure to keep adequate records was justified.  Accordingly, the Debtor's discharge will also be denied under Section 723(a)(3).

**C.      11 U.S.C. § 727(a)(4)**

---

[8]The Debtor went to some lengths to demonstrate that the former employees of Crossroad Sports were prejudiced against him.  Having directed them to assist him in committing fraud, failed to pay them promised past due wages, and challenged their veracity in open court, it must be acknowledged that his former employees do not admire him and that they have ample reasons for their position.  Although some of them freely admitted their dislike for him, the Debtor failed to demonstrate that their testimony was in any way false or tainted.  On the contrary, the Court finds that the former employees, unlike the Debtor, testified truthfully.

Section 727(a)(4)(A) provides that a court should not grant a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

11 U.S.C. § 727(a)(4); Nesse v. Pumphrey (In re Pumphrey), No. 10-0060PM, 2010 WL 3927233, at *1 (Bankr. D. Md. Oct. 5, 2010).  In order for the court to deny a debtor's a discharge pursuant to Section 727(a)(4)(A), a plaintiff must first establish that the debtor made a false oath or account; a plaintiff may satisfy this burden by showing that a debtor failed to disclose assets or transactions in their schedules and statement of financial affairs.  See In re Downey, 242 B.R. 5, 13-14 (Bankr. D. Idaho 1999); Farouki v. Emirates Bank Intern., Ltd. (In re Farouki), 14 F.3d 244, 251 (4th Cir. 1994); Britton Motor Service, Inc. v. Krich (In re Krich), 97 B.R. 919, 922-23 (Bankr. N.D. Ill. 1988); Johnson v. Baldridge (In re Baldridge), 256 B.R. 284, 290-91 (Bankr. E.D. Ark. 2000).  "A 'false oath' sufficient to merit a denial of discharge includes a misrepresentation or an omission in the debtor's bankruptcy schedules or Statement of Financial Affairs."  In re McLaren, 236 B.R. 882, 894 (Bankr. D.N.D. 1999) (citing In re Beaubouef, 966 F.2d 174, 178 (5th Cir.1992)).  The requisite intent to deceive exists where a debtor, in the first instance of filing a petition, schedules, or statement of financial affairs, makes statements—excluding honest mistakes—that are inconsistent or incompatible with his own knowledge and information.  Id. at 895.  Accordingly, if the Debtor's schedules and statements as filed contained materially incorrect information, then his discharge should be denied.

The record contains ample evidence that the Debtor's schedules and statements were deficient when filed, and that even subsequent amendments did not correct misstatements and omissions.  Most notably, the Debtor failed to disclose ownership of certain real property when he

originally filed his schedules and statements, and only after the Trustee discovered the property did the Debtor admit to having owned and sold it. The documentation and explanation of the Debtor regarding the proceeds of the sale of the property are supported by nothing other than his own testimony, which the Court has already concluded is wholly unreliable. The testimony of three other witnesses contradicts the Debtor's assertion that he paid his former employees thousands of dollars in cash without keeping any receipts.  Additionally, the Debtor failed to disclose ownership of vehicles and domain names when he filed the schedules and statements in the Crossroad Sports case, and only after the Trustee discovered those assets did the Debtor amend his schedules. Finally, the Debtor failed to list numerous creditors in the Crossroad Sports schedules, forcing them to contact the Trustee for information about the case. Accordingly, the Debtor's discharge will also be denied under Section 723(a)(4).

## IV. CONCLUSION

Based on the foregoing, the Court finds that substantial and credible evidence establishes that the Debtor misappropriated millions of dollars of inventory, instructed his employees to falsify accounting records, and filed materially false and misleading bankruptcy schedules under oath. While the Plaintiffs provided the Court with ample documentary evidence and the direct testimony of three witnesses in addition to the testimony of the Debtor, the Debtor presented no evidence, other than his denials under oath, to refute the evidence presented by the Plaintiffs.  The Court finds the testimony of the Debtor's former employees to be completely credible.  On the other hand, the Court has rarely seen a witness, such as the Debtor, who so utterly disregards the oath that every witness takes to tell the truth. Accordingly, the Court holds that the Plaintiffs have plainly met their burden of proving by a preponderance of the evidence that the Debtor, Joshua David Michael, violated

16

Sections 727(a)(2), 727(a)(3), and 727(a)(4) of the Bankruptcy Code.  As such, judgment will be entered in favor of the Plaintiffs, and the Debtor's discharge will be denied.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. A separate order will be entered contemporaneously herewith pursuant to Fed. R. Bankr. P. 9021.

**UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

IN RE:                                    )
                                          )
JOSHUA DAVID MICHAEL,                     )        Case No. 09-11623
                                          )        Chapter 7
                                          )
          Debtor.                         )
                                          )
                                          )
EVERETT B. SASLOW, Trustee, and           )
MICHAEL D. WEST, United States            )
Bankruptcy Administrator                  )
                                          )
          Plaintiffs,                     )        Adv. No.  10-02008
                                          )
vs.                                       )
                                          )
JOSHUA DAVID MICHAEL,                     )
                                          )
          Defendant.                      )

**<u>PARTIES IN INTEREST</u>**

Joshua David Michael

Everett B. Saslow, Esq.

Michael D. West, Esq.

18